**Gerald Patrick McFARLIN & Warren L. Taylor, Appellants,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**Willie D. WILLIAMS, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**Nos. 94–CO–1068, 94–CO–1069 and 94–CO–1461.**

District of Columbia Court of Appeals.

Argued Feb. 27, 1996.

Decided Aug. 1, 1996.

---

Ronald G. Dove, with whom Newman T. Halvorson, Jr., and Carol E. Bruce were on the brief, Washington, DC, for appellants McFarlin & Taylor.

Paul J. Kollmer, with whom Diane C. Gaylor, and Jacqueline A. Baillargeon, Washington, DC, were on the brief, for appellant Williams.

Sidney R. Bixler, Assistant Corporation Counsel, with whom Charles F.C. Ruff, Corporation Counsel, Robert R. Rigsby, Deputy Corporation Counsel, and Rosalyn Calbert Groce, Assistant Corporation Counsel, were on the briefs, for appellee.

Before STEADMAN [1], FARRELL, and REID, Associate Judges.

REID, Associate Judge.

These consolidated cases involve charges under the District of Columbia Panhandling Act, D.C.Code §§ 22–3311 et seq. (1989 repl.), against appellants Willie D. Williams, Gerald Patrick McFarlin and Warren L. Taylor. All three were convicted of violating § 3(b) of the Act, D.C.Code § 22–3312(b) which provides: "No person may ask, beg, or solicit alms in any public transportation vehicle; or at any bus, train, or subway station or stop." Taylor and McFarlin contend that their conduct did not violate the statute. In addition, all of the appellants challenge the constitutionality of § 3(b) of the Act. For the reasons stated below, we affirm the conviction of Mr. Williams and reverse the convictions of Mr. McFarlin and Mr. Taylor.

## FACTUAL SUMMARY

### Willie D. Williams

On September 9, 1993, the Corporation Counsel for the District of Columbia charged Mr. Williams with panhandling or begging "in an aggressive manner in an area open to the general public, in violation of D.C. Act 10–34, effective June 9, 1993." At the time, Mr. Williams was 32 years old, unemployed and lived in a shelter for homeless people. He received approximately $111 in food stamps each month, and from time to time would ask people on the street for money. On September 8, 1993, according to his testimony, he positioned himself at the Metro Center subway station above ground area at 12th and F Streets, N.W., held a paper cup in his hand and as people stepped off the subway escalator, said: "Sir, ma'am, can you spare a little change." Williams estimated that he was about six feet from the top of the escalator. He was arrested after asking Metro Transit police officers on "casual clothes detail" for change.

Officer Darryl T. Godinez was one of the arresting officers. He stated that he observed Mr. Williams around 2:25 p.m. at the Metro Center subway station. According to him, Mr. Williams "would get in front" of people when they reached "the top of the escalator," and would "stick the cup in front of them, blocking their path, and asking and begging for money." The other arresting officer, Donald L. Holman, estimated that Mr. Williams was "less than a foot" or "about a foot" from the escalator.

At the beginning of a hearing before a trial court commissioner on May 17, 1994, the District announced an oral amendment to the charge against Mr. Williams: "[W]hat we want to do, then, is to amend the information

---

1. Judge Steadman joins in this opinion with the exception of part I of the section entitled "The McFarlin and Taylor Convictions," which discusses an issue which in his view is not necessary to the disposition of this appeal. *See District of Columbia v. Wical Limited Partnership,* 630 A.2d 174, 182 (D.C.1993) ("[a]s a general rule, this court will decide only such questions as are necessary for a determination of the case presented for consideration, and will not render decisions in advance of such necessity, particularly when the question ... involves the construction of a statute") (quoting and adopting *Johnson v. Morris,* 87 Wash.2d 922, 557 P.2d 1299, 1305 (1976) (en banc)).

to charge 'non-aggressive' panhandling." Mr. Williams objected, but the commissioner allowed the oral amendment on the ground that since jeopardy had not attached, the District could dismiss the case and repaper it. He offered to postpone the hearing to allow more time for preparation, but counsel for Mr. Williams decided to proceed.

Prior to hearing testimony, the commissioner also ruled on Mr. Williams' December 17, 1993, motion to dismiss the information against him on First and Fifth Amendment constitutional grounds. He denied the motion and concluded that the Panhandling Act was constitutional because: (1) the District had a compelling interest to ensure "the safety and orderly maintenance of the flow of the customers, especially with respect to dangerous objects such as a moving escalator"; (2) the statute is narrowly tailored and does not foreclose alternative channels of communication; (3) the statute is content neutral and the term "no person" includes charitable organizations; and (4) the term "at a subway station" is not vague because "a reasonable man would know that being at the top of the escalators would mean that they were at the subway station." After ruling on the constitutionality issue, the commissioner heard the testimony of Officers Godinez and Holman, and Mr. Williams, and concluded that Mr. Williams violated § 3(b) of the Act. The only document designated for appeal which includes the commissioner's ruling is the Judgment and Commitment/Probation Order. According to that order, a five day jail sentence was imposed, but execution was suspended and Mr. Williams was ordered to complete ten hours of community service and ninety days of supervised probation. The sentence was stayed pending the outcome of any appeals.

On May 27, 1994, Mr. Williams filed a motion asking that a trial judge review and reverse the judgment of the commissioner, on the ground that the commissioner erred in declaring the statute constitutional. On August 25, 1994, the trial judge affirmed the commissioner's judgment, solely on the ground that "[t]he evidence presented to the Hearing Commissioner justified a finding

that the defendant was soliciting for money, and that he was on Metro subway station property at the time of the solicitation." The trial judge's order also contains the following factual findings:

> On May 17, 1994, the defendant proceeded to trial before a Hearing Commissioner on the offense of panhandling. The information filed with the Court reads as follows:

> Williams, Willie D. on or about the 8th day of September, 1993, at 12th & F Streets, N.W., did then and there: Beg in an aggressive manner in an area open to the general public.

> After hearing extensive testimony, including that of the defendant, the Hearing Commissioner found the defendant guilty of the charge.

> At the trial, evidence was presented by two Metro police officers that the defendant was observed standing at the top of the Metro escalator with a styrofoam cup in his hand. The officers testified that as the Metro passengers exited the escalator the defendant placed the styrofoam cup in the face of the passengers, blocking their direct egress from the escalator.

The trial judge's order summarized Mr. Williams' testimony that he was "standing on the sidewalk" and "by the side of the Metro elevator" with a McDonald styrofoam cup in his hand asking as passengers exited from the escalator, "Sir, ma'am, can you spare a little change."

Mr. Williams filed a motion on August 31, 1994, requesting a ruling on the constitutional issue which the commissioner had decided in favor of the District but which the trial court had not addressed at all. On October 11, 1994, the trial judge issued an order which rejected Mr. Williams' constitutional arguments, and concluded that "the statute denying the defendant the right to panhandle" on "Metro property ... at the very top of an escalator on which people were exiting from the subway station" constituted "a valid time, place and manner restriction." The trial judge cited *O'Brien v. United States,* 444 A.2d 946 (D.C.1982). Mr. Williams filed an appeal on November 9, 1994.[2]

2. After oral argument, the government filed a      motion challenging the timeliness of Williams'

## Warren L. Taylor and Gerald Patrick McFarlin

Mr. Taylor and Mr. McFarlin are professional musicians. They often played together in the above ground area of the Metro Center subway station. They regarded their playing at subway stops as an "advertisement" of their services. A September 15, 1993, information charged both men with panhandling or begging, "in a prohibited area to wit: Metro station in violation of D.C. Act 10–34, effective June 9, 1993."

Around 1:50 in the afternoon of July 21, 1993, Mr. McFarlin set up his electric keyboard which was about two feet long, two speakers and a battery in the roofed-in, above ground area of the Metro Center station stop, at 13th and G Streets, N.W. Three escalators were located at the stop; the one closest to the street was an ascending escalator and the other two were descending. Mr. Taylor had his saxophone, and a bucket was placed near him. The men played music and passersby dropped money in the bucket, although the men never asked for any money. The men asserted that money was given to them because of their "skill and musical ability."

Officer Carol Triplett of the Metro Transit Police saw Mr. McFarlin and Mr. Taylor while she was on duty and as she was about to get off the escalator ascending from the interior part of the Metro Center subway station to the street area. The men were closest to the two escalators that descended into the station; the middle escalator was not working. Officer Triplett initially thought that Mr. McFarlin was about sixteen feet from the escalators, and Mr. Taylor approximately eleven and a half feet. However, the hearing commissioner later questioned both her estimates of distance, and the need for any focus on distance. He made no factual findings regarding how far the men were located from the top of the escalator. Officer Triplett saw only a few subway passengers in the area, and did not observe Mr. McFarlin or Mr. Taylor blocking their passageway. The men stopped playing when they saw Officer Triplett and Mr. McFarlin started to put his equipment away. Other officers ar-

rived on the scene, and Officer Triplett arrested the men for panhandling. The money in the bucket, amounting to eighty dollars and sixty-eight cents, was taken as evidence.

After a hearing before a trial court hearing commissioner, § 3(b) of the Act was ruled to be constitutional, and Mr. McFarlin and Mr. Taylor were found guilty of violating the statutory provision. In an oral decision announced on February 1, 1994, the commissioner made few findings of fact, and most of his ruling was directed to the constitutionality of the statute, and the issue as to whether the presence of the bucket represented begging by the musicians, within the meaning of § 3(b). He concluded that: (1) the statute was content neutral in that it prohibited all conduct "designed or done for the purpose of obtaining an immediate donation of money or thing of value"; (2) the statute reflected a compelling governmental interest in the "safety and security of the commuting public" and was narrowly tailored to achieve that interest; (3) the statute imposed no prohibition on those wishing only to play music "at or near a subway stop"; and (4) Mr. Taylor and Mr. McFarlin were professional musicians, not beggars, but they were "soliciting" according to "the broadened definition of alms" contained in the statute and actually received money. He made no finding regarding how many feet Mr. McFarlin and Mr. Taylor were away from the subway escalator. Each man was ordered to pay a $10 fine.

A motion to review and reverse the commissioner's decision was duly made, and was denied by the trial court on March 8, 1994. The trial judge stated in part "I'm satisfied with [the] commissioner['s] ... ruling ... [because] he was correct." A joint notice of appeal was filed, but was withdrawn after Mr. McFarlin and Mr. Taylor became aware of the need to seek allowance of appeal within three days of judgment, pursuant to D.C.Code §§ 11–721(c), 17–301, and 17–307(b) (1989 Repl.). They were resentenced on May 23, 1994; the sentence was affirmed by the trial court on May 31, 1994; and on June 1, 1994, an application for allowance of

notice of appeal. We are satisfied that the appeal is properly before us.

appeal was filed. This court granted the application on August 24, 1994.

## ANALYSIS

Mr. Williams contends that § 3(b) of the Act (1) "impermissibly burdens speech protected under the First Amendment," and (2) "violates the Fifth Amendment because it fails to describe with sufficient specificity the location at which panhandling is prohibited." Mr. Taylor and Mr. McFarlin argue that (1) their actions of playing music and receiving "tips" did not violate the Act; and (2) § 3(b) of the Act is unconstitutional as applied to them, and unconstitutional on its face because it is overly broad and vague. The District of Columbia insists that the Act (1) imposes a "permissible restriction on appellants' activities" because it is reasonably related to a significant governmental interest; and it is not unconstitutionally overbroad or vague; and (2) the evidence is sufficient to support the conclusion that appellants violated the Act.

### The Panhandling Control Act of 1993

In 1993, the Council of the District of Columbia considered enactment of some measure that would address "growing problems related to the homeless" as well as panhandlers who "are in fact not homeless, but instead are confidence operators, who prey on the elderly and tourists who are uncertain about the genuine needs of the panhandler." *See* Council of the District of

Columbia, Report of the Committee on the Judiciary on Bill 10–72, the Panhandling Control Act of 1993, May 12, 1993, at 2. The Judiciary Committee report on the panhandling bill described its "purpose and effect" as follows:

> The purpose ... is to make aggressive panhandling a criminal offense when the panhandler causes or attempts to cause an individual reasonably to fear that they would be the subject of offensive physical contact. The bill makes it a criminal offense intentionally to obstruct traffic and parking or the free passage of persons in public places including the doorways and entrances of public or private buildings for the purpose of panhandling. Lastly, the bill creates zones in public streets and public transportation stations and stops as well as around automatic teller machines where asking, begging, or soliciting alms is prohibited.

*Id.* at 3–4. After extensive consideration, the Council passed the bill; it was duly enacted and approved as D.C. Law 10–54, effective November 17, 1993.[3]

The Act prohibits different kinds of conduct, including aggressive panhandling.[4] *See* D.C.Code, §§ 22–3311 *et seq.* Mr. Williams, Mr. Taylor and Mr. McFarlin all were charged ultimately with violation of § 3(b) of the Act, D.C.Code § 22–3312(b), although Mr. Williams initially was charged under § 3(a). Section 3(b) specifies that "No person may ask, beg, or solicit alms in any

---

**3.** Appellants were arrested under the emergency and emergency recess acts, which were identical to the permanent act. *See* D.C. Act 10–34, June 8, 1993, 40 D.C.Reg. 3827; and D.C. Act 10–98, August 4, 1993, 40 D.C.Reg. 6135.

**4.** D.C.Code § 22–3312 provides:
(a) No person may ask, beg, or solicit alms, including money and other things of value, in an aggressive manner in any place open to the general public, including sidewalks, streets, alleys, driveways, parking lots, parks, plazas, buildings, doorways and entrances to buildings, and gasoline service stations and the grounds enclosing buildings.
(b) No person may ask, beg or solicit alms in any public transportation vehicle; or at any bus, train, or subway station or stop.
(c) No person may ask, beg or solicit alms within 10 feet of any automatic teller machine (ATM).

(d) No person may ask, beg or solicit alms from any operator or occupant of a motor vehicle that is in traffic on a public street.
(e) No person may ask, beg or solicit alms from any operator or occupant of a motor vehicle on a public street in exchange for blocking, occupying, or reserving a public parking space, or directing the operator or occupant to a public parking space.
(f) No person may ask, beg or solicit alms in exchange for cleaning motor vehicle windows while the vehicle is in traffic on a public street.
(g) No person may ask, beg or solicit alms in exchange for protecting, watching, washing, cleaning, repairing, or painting a motor vehicle or bicycle while it is parked on a public street.
(h) No person may ask, beg or solicit alms on private property or residential property, without permission from the owner or occupant.

public transportation vehicle; or at any bus, train, or subway station or stop." Section 2(2) of the Act, D.C.Code § 22–3311(2), provides that " 'ask, beg, or solicit alms' includes the spoken, written, or printed word or such other act conducted for the purpose of obtaining an immediate donation of money or thing of value." Section 4 of the Act, D.C.Code § 22–3313, states that "[a]cts authorized as an exercise of a person's constitutional right to picket, protest, or speak, and acts authorized by a permit issued by the District of Columbia government shall not constitute unlawful activity under this chapter."

Also pertinent to our analysis is the Washington Metropolitan Area Transit Authority (WMATA) Regulation Concerning The Use By Others Of Washington Metropolitan Area Transit Authority Property. Section 100.10 of the Regulation concerns "free speech activities," defined in § 100.7(h) of the Regulation as "the organized exercise of rights and privileges which deal with political, religious, or social matters and are non-commercial." Section 100.10 provides that:

> Free speech activities are permitted in the free-area—"above ground" of metro stations. All free speech activities are to take place at a distance greater than fifteen (15) feet from any escalator, stairwell, fare gate, mezzanine gate, kiosk, or fare card machine. In no instances are any free speech activities to take place in the paid or platform areas of the station, or in the "underground" portions of stations. No free speech activities may interfere with the pedestrian traffic flow in the usual egress and ingress to the station proper or to the fare gate.

*Id.* at 20–21.

### The Williams Conviction

■ Mr. Williams argues that his First and Fifth Amendment rights have been violated. We review this matter *de novo* since it involves a legal issue. *See Salve Regina*

College v. Russell, 499 U.S. 225, 231, 111 S.Ct. 1217, 1220–21, 113 L.Ed.2d 190 (1991).

The record before us contains legal conclusions but no findings of fact made by the commissioner who conducted Mr. Williams' hearing pursuant to Super. Ct.Crim. R. 117(c).[5] However, the trial judge who reviewed the commissioner's judgment did make factual findings. Under Super. Ct. Crim.R. 117(g) a motion for review of the commissioner's order or judgment must "include a written summary of the evidence presented before the hearing commissioner relating to the grounds for objection." An opposing party must "describe any proceedings before the commissioner which conflict with or expand upon the summary filed by the moving party." In his motion for review, Mr. Williams summarized his version of the testimony of Officers Godinez and Holman, and stated that there was no interference "with the travel of pedestrians." The District's opposition to Mr. Williams' motion asserted that "officers [Darryl] Godinez and Donald Holman of the Metro Transit Police observed the defendant standing at the top of the escalator at Metro Center.... At no time did [Officer Godinez] see the defendant acting in an aggressive manner."

Notwithstanding the characterization of the hearing testimony by Mr. Williams and the District, the trial judge had the authority to "conduct [his] review either upon the written summary of the evidence presented by the parties or after listening to the tape or reading the transcript of the proceedings before the commissioner." *Speight v. United States*, 558 A.2d 357, 359–60 (D.C.1989). The trial judge appears to have listened to the tape or reviewed the transcript of the hearing. In his August 25, 1994, order, the trial judge found that Mr. Williams "was on Metro subway station property at the time of the solicitation" and that he "placed the styrofoam cup in the face of the passengers, blocking their direct egress from the escalator."[6]

---

5. Rule 117(c) provides in pertinent part: "Upon consent of the parties, a hearing commissioner may make findings and enter final orders or judgments in any non-jury criminal action in which the maximum fine provided by law does not exceed $300...."

6. The trial judge's August 25, 1994, order sets forth the original indictment charging begging "in an aggressive manner." His order does not mention the oral amendment of the charge against Mr. Williams to non-aggressive panhandling. Mr. Williams did not raise any issue re-

The trial judge also determined that Mr. Williams was "at the top of the Metro escalator." In ruling on Mr. Williams' motion for reconsideration, in an order filed on October 11, 1994, the trial judge concluded that "the defendant was on Metro property and panhandling at the very top of the escalator on which people were exiting from the subway," and "the statute denying the defendant the right to panhandle in this area was a valid time, place and manner restriction."

Section 3 (b) of the Act provides that, "No person may ask, beg, or solicit alms in any public transportation vehicle; or at any bus, train, or subway station or stop." Mr. Williams contends that this statute runs afoul of the First and Fifth Amendments to the Constitution because it impermissibly burdens speech and "it fails to describe with sufficient specificity the location at which panhandling is prohibited." We disagree.

■ In *International Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992), a case involving a non-profit religious corporation, the Supreme Court of the United States said: "It is uncontested that the solicitation at issue in this case [contributions at airport terminals] is a form of protected speech under the First Amendment." 505 U.S. at 677, 112 S.Ct. at 2704 (referencing *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) and *United States v. Kokinda*, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990)). It has also been held, and we assume here without deciding, that begging "implicates expressive conduct or communicative activity" and is regarded as " 'a form of speech.' " *Loper v. New York City Police Dep't*, 999 F.2d 699, 704 (2d Cir.1993).[7] However, neither the Act in its entirety nor § 3(b) prohibits all begging in open or public places in the District of Columbia.[8]

In moving the panhandling bill for first reading at the Council's June 1, 1993, legislative session, the Chairman of the Judiciary Committee, Mr. Nathanson, stated:

> The bill repeals that portion of the District['s] 1941 vagrancy law that prohibits begging in any form . . . , therefore making non-aggressive panhandling a legitimate activity in the District of Columbia.

Council of the District of Columbia, Council Period X, Tenth Legislative Meeting, Transcript, June 1, 1993, at 27. Hence, the Council in approving the bill did not intend to preclude all begging or solicitation in the District. Nonetheless, the Council sought to regulate begging and solicitation. This is permissible under our Constitution. As the Supreme Court has said: "[I]t is also well settled that the government need not permit all forms of speech on property that it owns and controls." *International Soc'y for Krishna Consciousness*, 505 U.S. at 678, 112 S.Ct. at 2705. Here the government has chosen not to permit begging or solicitation "at a subway station or stop."

The legislative history suggests that the Council intended to prevent begging or solicitation in any part of a subway station or stop which would create a public safety problem. As Councilmember Ray, a member of the Judiciary Committee, said during the Council's June 1, 1993, legislative session:

> [The] bill does not outlaw panhandling. It only outlaws aggressive panhandling. It permits panhandling. . . . [It] . . . has also outlawed a second kind of conduct, . . . which creates a public safety problem. . . .

Consistent with Mr. Ray's statement, it appears that the Council was primarily concerned about public safety in enacting the non-aggressive panhandling sections of the Act, including § 3(b). It sought to prohibit

garding whether the order confirmed a conviction under § 3(a) of the Act rather than § 3(b) under which he ultimately was tried.

**7.** *But see also Young v. New York City Transit Auth.*, 903 F.2d 146 (2d Cir.) *cert. denied*, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990)

**8.** In that regard, § 3(b) of the Act is unlike § 240.35(1) of the New York Penal Law (McKin-

ney 1989) which was construed in *Loper*, and which specified:

> A person is guilty of loitering when he (1) Loiters, remains or wanders about in a public place for the purpose of begging. . . .

The *Loper* court concluded that the New York law was unconstitutional under the First Amendment.

panhandling in certain places where public safety could be compromised by disrupting the smooth flow of pedestrian or vehicular traffic. The subway station or stop was one of those places.[9] Through its fifteen foot rule and for public safety reasons, WMATA has also sought to prohibit free speech activities in certain areas of its property. Specifically, it has prohibited such activities within fifteen feet of the top of a subway escalator.[10]

■ Section 3 (b) of the Act, as relevant here, provides that soliciting may not take place "at any ... subway station or stop." As the Act does not define "subway station or stop," this court should construe that phrase in a manner that avoids possible constitutional difficulties. *Boos v. Barry,* 485 U.S. 312, 331, 108 S.Ct. 1157, 1169, 99 L.Ed.2d 333 (1988); *see also In re E.D.P.,* 573 A.2d 1307, 1309 (D.C.1990). The Council of the District of Columbia reasonably could assume that § 3(b) of the Act would be interpreted in light of WMATA's particular needs and concerns. WMATA's regulation provides a reasonable gloss on the meaning of "at any ... subway station or stop," and we therefore construe § 3(b), insofar as relevant here, as prohibiting all panhandling (whether "aggressive" or nonaggressive) within fifteen feet of the escalator entrance.

■ So interpreted, the statute does not necessitate the heightened First Amendment scrutiny applicable to public fora. "[A] traditional public forum is property that has as 'a principal purpose ... the free exchange of ideas.'" *International Soc'y for Krishna Consciousness v. Lee, supra,* 505 U.S. at 679, 112 S.Ct. at 2705 (quoting *Cornelius v. NAACP Legal Defense and Educ. Fund,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3447–48, 87 L.Ed.2d 567 (1985)). No one can fairly argue that the entranceway to (or point of egress from) a subway escalator—defined as the area within fifteen feet of the entrance—is a place whose principal purpose is the free exchange of ideas. Its primary purpose, indeed its only practical purpose, is as an area within which pedestrian traffic is funnelled onto the escalator. Moreover, it is not a "designated public forum," *id.* at 678, 112 S.Ct. at 2705; WMATA has explicitly prohibited expressive activity within that limited area.

Since we are faced with a non-public forum area, our review of § 3(b) of the Act is restricted. We need only determine whether § 3(b) is "reasonable" and whether it "is an

9. Mr. Williams cites a statement attributed to Councilmember Ray to argue that the legislative history does not specify the location at which § 3(b) is to apply. The attribution is made in the Committee Report on the panhandling bill:

> Mr. Ray moved that the phrase "or within 5 feet of the grounds on which any bus, train, or subway station or stop is located" be deleted from the end of section 3(b). He considered a prohibition in the bus stops or subway stations to be alright [sic], but he felt a person should be able to ask for a quarter next to these areas as long as it is not aggressive.

While Mr. Ray considered that asking someone for a quarter is free speech, he also expressed concern about public safety, and concluded that there are certain places where panhandling should not be permitted at all. He said in part:

> I do think it's free speech to ask someone for a quarter. I, you know, free speech is not totally free. You can't yell fire in a theater and I don't think you can aggressively panhandle.... I don't think you should be panhandling where you create public safety, that is, panhandling in the middle of the streets where cars are trying to move and etcetera, etcetera. But I do have problems with saying that someone can't panhandle within 5 feet of a, of a

subway station or a bus stop.... So I would have one suggestion. It's that we have this aggressive panhandling prohibition, but then we would have another subtitle which would, in effect, prohibit panhandling under all conditions. And that's what you're really doing here when you talk about soliciting on the streets and soliciting on the subways. It's not aggressive panhandling, you're just saying you can't panhandle there.

Council of the District of Columbia, Committee on the Judiciary, Meeting of May 12, 1993, Transcript at 20–21. Councilmember Ray did not use the language that appears in the Committee Report. His comments in proposing his amendment to § 3(b) are consistent with those he made at the June 1, 1993 legislative session that the bill "has also outlawed a second kind of conduct, ... which creates a public safety problem...."

10. Although the court in *Community For Creative Non–Violence v. Turner,* 282 U.S.App. D.C. 238, 242, 893 F.2d 1387, 1391 (1990), concluded that "the above-ground free areas of the WMATA stations are public fora, either in traditional terms or by designation," the court did not specifically address WMATA's fifteen foot rule. It addressed the permit requirement which only had applicability outside the fifteen foot zone.

effort to suppress the speaker's activity due to disagreement with the speaker's view." *Id.* at 679, 112 S.Ct. at 2705. The District has not attempted to suppress the speech of beggars who wish to communicate regarding their plight by asking for money. Beggars may engage in soliciting in many different parts of the District where open or public space is located. Indeed, had Mr. Williams moved several feet into space away from the top of the escalator and engaged in peaceful begging by asking whether someone could spare some change, his activity would have been lawful. However, he solicited at the top of the escalator, a foot or less away from where passengers were trying to step off the escalator from the interior of the subway station. We conclude that § 3(b), as we have construed it, is a reasonable regulation of begging. It is designed to ensure public safety by prohibiting conduct that may be reasonably expected to disrupt or impede the smooth flow of pedestrian subway traffic within fifteen feet of a subway escalator.

■■■ In *O'Brien v. United States*, 444 A.2d 946, 949 (D.C.1982),[11] we concluded that the fifteen foot WMATA regulation "serves a significant governmental interest by ensuring an orderly flow of pedestrian traffic on and off the escalator and, in turn, avoiding congestion at the escalator's entrance or exit which could cause injury." We also determined that the regulation "directly advances the governmental interest asserted and is reasonably narrow, given the necessity of restricting this activity where congestion of pedestrian traffic poses the greatest danger." *Id.* Section 3(b) of the Act similarly advances the District's significant interest in promoting public safety and convenience at a subway station or stop, while leaving those engaged in expressive activity readily available alternative means of communicating their message. There is nothing in the legislative history to even remotely suggest that the

Council sought to prohibit beggars from engaging in expressive conduct because of any disagreement with their message or intent to suppress it. The Council's public safety purpose clearly was unrelated to the suppression of ideas.[12] In fact, § 4 of the Act, D.C.Code § 22–3313 specifies that "[a]cts authorized as an exercise of a person's constitutional right to ... protest, or speak ... shall not constitute unlawful activity under this act." Furthermore, § 3(b), as we have construed it, is narrow in scope and does not cut off all right to solicit or beg in a non-aggressive manner. Nor does it focus only on beggars; it covers all those who seek to obtain "an immediate donation of money or thing of value."

■■■ Mr. Williams also argues that § 3(b) violates his Fifth Amendment rights and is unconstitutionally vague because "it fails to describe with sufficient specificity the location at which panhandling is prohibited." We disagree. We have previously ruled that:

> The specific terms of the statute need not be defined with mathematical precision. As long as a person of ordinary intelligence exercising common sense, can understand and comply with the dictates of a statute, due process is not offended.

*In re L.E.J.*, 465 A.2d 374, 378 (D.C.1983) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 607–08, 93 S.Ct. 2908, 2913–14, 37 L.Ed.2d 830 (1973) (other citations omitted)). "To withstand a vagueness challenge, a statute 'must state its standard with adequate clarity and mark sufficiently distinct boundaries for the law to be fairly administered.'" *Id.* (citing and quoting *In re J.S.R.*, 374 A.2d 860, 862–63 (D.C.1977)). Section 3(b) of the Act meets this standard.

The term "at a subway station or stop," as construed in light of the WMATA regulation, is not unconstitutionally vague. A complete ban on soliciting within fifteen feet of the escalator provides unmistakable "notice to

---

11. O'Brien was charged under D.C.Code § 22–3102 (1981) with unlawful entry, which prohibited a person from remaining on private or public property without authority and when told to leave by one lawfully in charge of the property. O'Brien was distributing commercial handbills at a subway station near the top of the subway escalator.

12. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others..... [G]overnment regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Ward*, 491 U.S. at 791, 109 S.Ct. at 2753.

those of ordinary intelligence" and "conveys sufficiently definite warnings as to the proscribed conduct when measured by common understanding and practices." *Ricks v. District of Columbia,* 134 U.S.App. D.C. 201, 206, 414 F.2d 1097, 1102 (1968).[13] And Mr. Williams' conduct clearly fell within that proscription. The trial judge found that he "was on Metro property and panhandling at the very top of the escalator on which people were exiting from the subway." Officer Holman testified that Mr. Williams was "less than a foot" or "about a foot" from the subway escalator. Mr. Williams himself estimated that he was six feet away from the escalator. Indeed, whatever the breadth of strictures of § 3(b)'s interpretation, Mr. Williams can hardly assert surprise that his particular activities, carried on here and as they were at that subway escalator would be held to violate that subsection.

In short, § 3(b) does not impermissibly burden free speech; nor is it unconstitutionally vague either under the First or Fifth Amendments. Hence, we affirm Mr. Williams' conviction.

### The McFarlin and Taylor Convictions

Mr. McFarlin and Mr. Taylor contend that (1) their actions were not prohibited by the Act; or (2) the Act is unconstitutional as applied to them, and unconstitutional on its face because it is overly broad and vague.

### I.

◼ We turn first to the question as to whether the Act, as drafted, covers the conduct engaged in by Mr. McFarlin and Mr. Taylor. The men played music and put a bucket on the ground to collect coins and bills, although they never asked for any mon-

ey. The Act was not designed to reach two gainfully employed men who simply play music in the above ground area of a metro station. Nor were Mr. McFarlin and Mr. Taylor arrested for playing music.[14] They were arrested for soliciting an immediate donation of money by placing a bucket in front of them while they played musical instruments.

Although the title of the Act uses the word "panhandling," the word does not appear in the text of the Act. Nevertheless, to panhandle is to beg on the streets, and a panhandler is commonly regarded as a person who begs on the streets. *See* WEBSTER'S NEW WORLD DICTIONARY (2d college ed.1982). As the trial court commissioner concluded, Mr. McFarlin and Mr. Taylor are professional musicians, not beggars. Yet, even though the terms panhandling and begging may not ordinarily be applied to them, the statute, as drafted, covers their conduct.

We are bound by and must apply the plain words of § 3(b) to these cases.[15] The statute defines the words "ask, beg, or solicit alms" to include an "act conducted for the purpose of obtaining an immediate donation of money or thing of value." These words are not ambiguous. A "donation" is defined as a "gift" or a "contribution," and may connote a charitable gift or contribution. *See* WEBSTER'S NEW WORLD DICTIONARY, *supra.* In the musical world, donations may be given during or after a musical performance. In placing a bucket on the ground Mr. McFarlin and Mr. Taylor signaled that they would accept an immediate donation of money. Under the plain meaning of the statute, they received an immediate donation of eighty dollars. In short, they solicited money to be placed in a bucket in front of them. Accord-

---

**13.** We are not presented with the type of vague terminology the court confronted in *Ricks.* The sections of the District's vagrancy law which were invalidated in that case contained such vague terms that one could not determine objectively what constituted lawful or unlawful conduct. These words included "loitering," "leading an immoral or profligate life," "wanders without any visible or lawful business," and "not giving a good account of [oneself]."

**14.** The Supreme Court has recognized that "[m]usic is one of the oldest forms of human

expression." *Ward v. Rock Against Racism,* 491 U.S. 781, 790, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989).

**15.** "In interpreting a statute, we are mindful of the maxim that we must look first to its language; if the words are clear and unambiguous, we must give effect to its plain meaning." *J. Parreco & Son v. Rental Hous. Comm'n,* 567 A.2d 43, 45 (D.C.1989) (citing *Office of People's Counsel v. Public Serv. Comm'n,* 477 A.2d 1079, 1083 (D.C.1984)).

ingly, we cannot conclude that, as drafted, the statute does not cover the conduct engaged in by Mr. McFarlin and Mr. Taylor.[16]

## II.

██ Mr. McFarlin and Mr. Taylor were not charged with having panhandled in an aggressive manner, and, as we read the record, the government's proof in the eyes of the fact finder failed to establish that they solicited within fifteen feet of the escalator top. Hence, we must reverse their convictions for insufficient evidence.

As discussed above, Officer Triplett testified fairly early in her testimony that Mr. McFarlin was about sixteen feet from the subway escalators, and Mr. Taylor was approximately eleven and a half feet from the escalators. If credited as accurate, that testimony would have placed Mr. Taylor within the forbidden fifteen-foot area. However, this was the only evidence that either appellant was located within the fifteen-foot zone, and—while the hearing commissioner did not consider the fifteen-foot rule to be relevant— it is apparent that as the testimony continued, the hearing commissioner eventually did not credit Officer Triplett's earlier testimony with regard to Mr. Taylor's distance from the escalators. As the commissioner observed, Officer Triplett was "evidently having trouble with this distance" and was unable clearly to measure or estimate the distance of Mr. Taylor from the subway escalator in comparison with that of a flower vendor, and the officer's diagram of the area presented problems and was not drawn to scale. In their application for allowance of appeal, Mr. McFarlin and Mr. Taylor asserted that the evidence showed that they performed more than fifteen feet from the nearest escalator. The commissioner's certification to this court of the facts set out in the application for allow-ance of appeal reflects, in our judgment, an effective finding that the government had not shown beyond a reasonable doubt that Mr. McFarlin and Mr. Taylor solicited within the forbidden fifteen-foot area. Accordingly, we must reverse the convictions for insufficient evidence to prove the charged violation of the statue. *Cf. Smith v. United States,* 601 A.2d 1080 (D.C.1992); *McGee v. United States,* 533 A.2d 1268 (D.C.1987).[17]

For the foregoing reasons, as to Mr. McFarlin and Mr. Taylor, we remand with directions to enter judgments of acquittal, and as to Mr. Williams, we affirm his conviction.

*So ordered.*

---

**16.** Mr. McFarlin and Mr. Taylor describe the money they received as "tips" for a service. The word "tip" generally is associated with employment involving the performance of some personal service. It cannot be said that Mr. McFarlin and Mr. Taylor were "employed" when they played music at the Metro Center station. In the context in which they performed, as the trial court commissioner concluded, their "tips" constituted "gratuities" or "donations." Mr. McFarlin and Mr. Taylor also contend that the word "alms" is associated with poor people. This is generally true, but as the trial court commissioner pointed out, the Council used a "broadened definition" of that word—"an immediate donation of money or thing of value."

**17.** In *Smith* and *McGee* we found the evidence insufficient to support a conviction of attempted battery assault, and remanded the cases for entry of judgment of acquittal.