949 F.Supp. 1035 (1996)
Stanley ISRAEL, as President of the Correction Officers Benevolent Association, Inc., and the Correction Officers Benevolent Association, Inc., Plaintiffs,
v.
Catherine M. ABATE, as Commissioner of the Department of Correction of the City of New York, the New York City Department of Correction, Robert La Pene, Acting Commissioner for Labor Relations for the New York City Department of Correction, Richard Yates, Assistant Commissioner for Labor Relations for the New York City Department of Correction, James Hanley, Commissioner of the Office of Labor Relations of the City of New York, Michael McDonald, Assistant Commissioner of the Office of Labor Relations of the City of New York, and the City of New York, Defendants.
No. 93 Civ. 3321 (JES).
United States District Court, S.D. New York.
December 11, 1996.
*1036 *1037 Tellerman, Paticoff & Greenberg (Philip E. Taubman, of counsel), New York City, for Plaintiffs.
Paul A. Crotty, Corporation Counsel of the City of New York (R. Townsend Davis, Jr., Assistant Corporation Counsel, of counsel), New York City, for Defendants.

*1038 MEMORANDUM OPINION AND ORDER
SPRIZZO, District Judge:
Pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983, plaintiffs Stanley Israel and the Correction Officers Benevolent Association, Inc. ("COBA") bring the instant action for declaratory judgment, seeking to enjoin defendants from prohibiting plaintiffs from posting and distributing union fliers at the Control Building of the Rikers Island Correctional Facility in New York ("Rikers"). Pursuant to Federal Rule of Civil Procedure 56, defendants move and plaintiffs cross-move for summary judgment. For the reasons that follow, defendants' motion for summary judgment is granted, and plaintiffs' motion for summary judgment is denied.

BACKGROUND
The Department of Corrections of the City of New York (the "DOC") operates ten correctional facilities on Rikers Island in Queens, New York ("Rikers"). Defendants' Statement of Undisputed Facts Pursuant to Local Rule 3(g) ("Defs.' 3(g) Stmt.") ¶ 1. Plaintiff COBA is a labor union which represents approximately 10,000 corrections officers of the DOC. Id. ¶¶ 10, 14; Plaintiffs' Statement of Undisputed Facts Pursuant to Local Rule 3(g) ("Pls.' 3(g) Stmt.") ¶ 1. COBA is the largest of approximately twenty competing unions which represent DOC employees. See Deposition of Robert LaPene (undated), attached at Exh. H to Plaintiffs' Notice of Cross-Motion ("Pls.' Not. Mot.") at 7. At all times pertinent, Stanley Israel was president of COBA. Pls.' 3(g) Stmt. ¶ 1. Philip Seelig served as Special Counsel to COBA, and Frank Ayala acted as a lobbyist for COBA. Id. ¶¶ 2, 5.
In March 1993, COBA scheduled a mail ballot membership vote for April 1993. Pls.' 3(g) Stmt. ¶ 5. The vote concerned the retention, at specified salaries, of Philip Seelig as COBA Special Counsel, and Frank Ayala as a COBA lobbyist. Defs.' 3(g) Stmt. ¶ 15. The COBA leadership of ten board members and forty delegates, including Israel, supported the continued employment of both men. Id. ¶ 17.
Prior to March 8, 1993, fliers, which incorrectly stated that unmailed ballots would be counted as "yes" votes, were distributed to corrections officers. Defs.' 3(g) Stmt. ¶ 20. In response, on March 8, 1993, a COBA officer created and sent the DOC Office of Labor Relations two single-page fliers which informed union members that they must mail in their ballots in order to have their votes counted, and urging a "yes" vote on the ballot issue. Id. ¶ 19; Pls.' 3(g) Stmt. ¶ 18. The fliers in question appeared on COBA letterhead and are set forth in full at Appendix A attached hereto.
Since Israel became president in January 1993, COBA has communicated to its membership by distributing or posting fliers on about thirty to thirty-five occasions. See Pls.' 3(g) Stmt. ¶¶ 1, 10, 31.
Article XXV of the collective bargaining agreement between COBA and New York City governs the posting of union literature on DOC facility bulletin boards. Id. ¶¶ 26, 27. That provision provides:
The Union may post notices on bulletin boards in places and locations where notices usually are posted by the Employer for employees to read. All notices shall be on Union stationery, shall be used only to notify employees of matters pertaining to Union affairs, and shall not contain any derogatory or inflammatory statements concerning the City, the Department, or personnel employed by either entity.
Pls.' Not. Mot. at Exh. A.
Since January 1993, COBA has also hand distributed fliers on numerous occasions by passing them out in the Rikers Island Control Building, on the Queens side of Rikers Island, and in the locker rooms of individual buildings on Rikers. Pls.' 3(g) Stmt. ¶ 10. COBA contends that handing out fliers is the most effective means of communicating with its membership. Id. ¶ 9. In practice, COBA has always sent a copy of the flier to be distributed to the DOC Labor Relations Office. Id. ¶ 11. However, COBA contends that the Office of Labor Relations was entitled to receive a copy of the fliers intended for distribution but not to deny permission for distribution. Id. ¶ 11.
*1039 The DOC policy governing hand distribution of union literature in the Control Building by candidates for union office is set forth in several memoranda issued by the Labor Relations Department. By memorandum dated June 2, 1986, the Director of Labor Relations informed Rikers commanding officers that the DOC and COBA had reached an agreement allowing COBA to distribute materials at the Control Building "provided that this office has been notified first." Pls.' Not. Mot., Exh. B. By memoranda issued in October and November 1988, June 1992, and January 1993, DOC Chief of Operations informed Rikers commanding officers that:
Distribution or posting of literature or soliciting of petitions or any other similar activities on departmental premises is prohibited unless provided for by collective bargaining agreement and/or departmental policy and procedure. However, certified or designated employee organizations upon notification to the Department's Office of Labor Relations, who will advise the Rikers Island Security Division, shall be permitted to distribute official union material at the Control Building. Such distribution shall be accomplished so that minimum disruption and distraction is created in the area.
Any requests for exceptions to this prohibition as it relates to unions and their members shall be cleared through the Office of Labor Relations whose decision will be based upon applicable law, policy and procedures.
At no time shall materials be distributed within the institutions except as provided by memorandum [relating to COBA election campaigning] or at authorized union meetings.
Id. at Exhs. E, F, G, and H.
Since January 1993, COBA has also used various other methods to disseminate voting information to its members. On several occasions, COBA placed advertisements in newspapers, such as the New York Post and the Daily News, held meetings to discuss specific issues with corrections officers, issued press releases, held "media events," and conducted mass mailings. Defs.' 3(g) Stmt. ¶¶ 36, 40, 41, 43, 44. On several occasions, COBA was allowed to utilize DOC teletype facilities. Id. ¶ 46; Pls.' 3(g) Stmt. ¶ 13. In addition, COBA has held monthly membership meetings and other meetings in common areas of individual correctional facilities such as chapels and auditoria. Defs.' 3(g) Stmt. ¶¶ 42, 43.
With regard to the March 1993 vote, Israel submitted the two fliers to the DOC Office of Labor Relations, indicating that he wished to hand-distribute these fliers to Corrections Officers at the DOC Control Building on Rikers. Pls.' 3(g) Stmt. ¶ 15. The Control Building is the first building after crossing the Francis R. Buono Bridge onto Rikers Island from Queens. Defs.' 3(g) Stmt. ¶ 3. In addition, the Control Building is the sole means of pedestrian access by uniformed DOC employees onto Rikers. Id. ¶ 3. The Control Building is also the central area through which all DOC employees and any law enforcement officials conducting business on Rikers Island must pass.[1] Defs.' 3(g) Stmt. ¶ 4.
Each Corrections Officer seeking entry undergoes an identity check as well as a security check in order to prevent the smuggling of contraband onto Rikers. Id. ¶ 7. At the Control Building, each officer is required to produce his shield and identification and to allow any bags to be searched by security officers. Id. ¶ 7. The same procedure is repeated upon exit from Rikers Island through the Control Building. Id. ¶ 7. During a typical three-shift day, a total of about 4,500 corrections officers undergo these security checks. Id. ¶ 6. The searches are concentrated around the three daily shift changes. Id. ¶ 6. For these reasons, the DOC has implemented strict security measures to ensure efficient functioning at the Control Building. Id. ¶¶ 7, 8.
Citing security concerns, as well as a policy of discouraging unrestricted distribution of materials in the area, on March 8, 1993, the DOC Office of Labor Relations denied *1040 COBA permission to distribute the two proposed March 1993 fliers at the Control Building.[2] Defs.' 3(g) Stmt. ¶¶ 12, 23, 26. In support of its decision, the DOC pointed to the fliers' alleged "inflammatory and inaccurate contents." Id. ¶ 24. Specifically, the DOC objected to the portion of the second flier which stated that, "[t]he administration would like to take away [Corrections Officers'] off-duty guns."[3]Id. ¶ 24. The DOC reasoned that rescinding such privileges would most likely have been met with great disfavor by the Correction Officers and could have contributed to operational instability or even labor unrest among Corrections Officers, which in turn would pose a security risk at a highly sensitive place such as the Control Building.[4] Defs.' 3(g) Stmt. ¶¶ 10, 24. Plaintiffs contend that this was the only time that the Office of Labor Relations disallowed COBA from posting or disseminating written materials. Israel Dep. at 26, 29.
Following this decision by the DOC, Israel did not direct that either flier be hand-distributed on Rikers. Defs.' 3(g) Stmt. ¶ 27. Instead, COBA mass-mailed fliers to all its members urging a "yes" vote. Id. ¶ 50. COBA leadership also held several meetings in common areas on Rikers to advocate its position and discussed the issue at monthly meetings open to the union's general membership. Id. ¶¶ 52, 53.
In March 1993, COBA mailed the ballots to each of its members. Id. ¶ 54. On April 15, 1993, the votes were tallied, and Seelig and Ayala's continued employment with COBA was rejected. Id. ¶ 55. COBA does not dispute this result. Id. ¶ 56.
On May 14, 1993, Israel and COBA filed the instant action seeking, inter alia, declaratory judgment that defendants violated plaintiff's constitutional rights and to enjoin defendants from barring future distribution of union-related literature and comparable material in the Control Building. Complaint ("Compl.") at 5.

DISCUSSION
Summary judgment is appropriate where "there is no genuine issue as to any fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52, 106 S.Ct. 2505, 2509-12, 91 L.Ed.2d 202 (1986). A party seeking summary judgment carries the burden of demonstrating the absence of any genuine issue of material fact. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).
It is well-established that the government, acting as an employer, may regulate the speech of its employees far more extensively than that of the general public. See Waters v. Churchill, 511 U.S. 661, 671-72, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994) (plurality); Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO, 413 U.S. 548, 564, 93 S.Ct. 2880, 2889-90, 37 L.Ed.2d 796 (1973); Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968). Therefore, in order to establish that a government employer violated the free speech rights of its employee *1041 by restricting the dissemination of information based upon its content, a plaintiff must establish that 1) the speech is a matter of public concern, and 2) the employee's interest in expression outweighs any injury the speech could cause to the state's interest in the efficient performance of its public services. See Connick, 461 U.S. at 142, 103 S.Ct. at 1687 (citing Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35). However, "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." Id. at 146, 103 S.Ct. at 1690.
Whether speech constitutes a public concern is an issue of law to be determined by Court based upon the "content, form, and context of a given statement." Id. at 147-48, 103 S.Ct. at 1690; see also Frank v. Relin, 1 F.3d 1317, 1328 (2d Cir.), cert. denied, 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993); Giacalone v. Abrams, 850 F.2d 79 (2d Cir.1988). Issues of public concern protected by the First Amendment include public institutional policies, the integrity of governmental entities, breaches of the public trust or the expenditure of public funds. See, e.g., Rankin v. McPherson, 483 U.S. 378, 384-85, 107 S.Ct. 2891, 2896-97, 97 L.Ed.2d 315 (1987) (statement by employee of prosecutor's office about federal policies and the assassination attempt on the U.S. President); Frank, 1 F.3d at 1329-30 (statement by victim-witness coordinator in prosecutor's office about suppression of exculpatory material); Bieluch v. Sullivan, 999 F.2d 666, 671 (2d Cir.1993) (police officer's public views about taxes, school budgets, and public construction projects), cert. denied, 510 U.S. 1094, 114 S.Ct. 926, 127 L.Ed.2d 219 (1994); Piesco v. City of New York, Dep't of Personnel, 933 F.2d 1149, 1157 (2d Cir.) (testimony before legislative committee about police exam), cert. denied, 502 U.S. 921, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991); Vasbinder v. Ambach, 926 F.2d 1333, 1341 (2d Cir.1991) (allegation to FBI of fraudulent overbilling in federally funded program); Rookard v. Health and Hosps. Corp., 710 F.2d 41, 46-47 (2d Cir.1983) (allegations of corruption in agency).
Where, as here, the content of the fliers is primarily to further the interest of the speaker rather than to address matters of concern to the general public, the speech is not of public concern. See, e.g., Connick, 461 U.S. at 147, 103 S.Ct. at 1690 (speech concerning working conditions and morale); White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1060 (2d Cir.) (officer's allegation of defamation by state police officer), cert. denied, 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993); Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir.) (doctor's complaint of discrimination), cert. denied, 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991); Barkoo v. Melby, 901 F.2d 613, 619 (7th Cir.1990) (emergency dispatcher's discussion about unknown taping of her conversations).
Here, it is clear that the primary purpose of the fliers was to further the internal union interest of employing Ayala and Seelig to act on behalf of COBA. These fliers encouraged members to vote for the continued employment of the COBA counsel and lobbyist and warned of the implications of a defeat of that proposal, issues which relate to internal union and employment affairs and are of primary interest only to union members. See Connecticut State Fed'n of Teachers v. Bd. of Educ. Members, 538 F.2d 471, 481 (2d Cir. 1976). COBA president Israel authored these fliers for distribution to COBA members, the only people eligible to vote on the proposals. Pls.' 3(g) Stmt. ¶ 19. Moreover, it is undisputed that Israel created them for the dual purpose of urging a "yes" vote and correcting a statement contained in a previous flier that unmailed ballots would be affirmatively counted. Id. ¶¶ 19, 20; Israel Dep. at 53-55. The fliers do not address the impact of the vote upon the DOC or the general public, the expenditures of tax money, breaches of the public trust, or the integrity of DOC officials.[5] Furthermore, the DOC played no role in the formulation of the *1042 ballot proposal or the voting, which was handled by an outside agency. Defs.' 3(g) Stmt. ¶ 57.
Because plaintiffs cannot establish that the speech set forth in the fliers was a matter of public concern, their First Amendment claim must be rejected. See Waters, 511 U.S. at 667-68, 114 S.Ct. at 1884; Rankin, 483 U.S. at 384-85, 107 S.Ct. at 2896-97; Frank 1 F.3d at 1328; see also Connick, 461 U.S. at 148, 103 S.Ct. at 1690-91 (mere fact that speech could have effect upon functioning of government department insufficient to create public concern).
Moreover, plaintiffs have failed to establish any rational basis for an inference that the Control Building at Rikers is a public forum. "The public or private nature of the facilities or fora in which First Amendment rights are sought to be exercised, the nature of their essential purpose, and the normal use made of them, are factors to be considered in determining whether a denial of access to the facilities or fora constitutes an abridgement of First Amendment Rights." Connecticut Teachers, 538 F.2d at 480. The state may create a public forum by opening a space to the general public for the purpose of expressive activity. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 954-55, 74 L.Ed.2d 794 (1983). In addition, the government may create a limited public forum by opening space to use for a limited purpose, such as use by certain groups. See id. at 45-46 & n. 7, 103 S.Ct. at 954-56 & n. 7.
Here, the primary purpose of the Control Building is to be the exclusive security checkpoint for uniformed officers at Rikers Island correctional facilities. All ingress and egress from Rikers Island by employees is strictly regulated through the Control Building to prevent security risks, such as smuggling contraband. The Control Building is not open to the public, which enters or exits Rikers Island through an adjacent building. See United States v. Grace, 461 U.S. 171, 179-80, 103 S.Ct. 1702, 1708-09, 75 L.Ed.2d 736 (1983) (separation from acknowledged public areas may serve to indicate that separated property is a special enclave subject to greater restriction), cert. denied, 474 U.S. 1026, 106 S.Ct. 583, 88 L.Ed.2d 565 (1985). Nor is the Control Building used for solicitation or advertising by business or civic groups. Defs.' 3(g) Stmt. ¶ 5.
The fact that the DOC has allowed COBA to distribute non-election fliers which had been cleared by the Department of Labor Relations does not change the building's nature as a restricted security enclave. See Perry, 460 U.S. at 47, 103 S.Ct. at 956 (where school allowed local civic and church groups access to teachers' mailboxes and school mail system, Court held that "[t]his type of selective access does not transform government property into a public forum."); Greer v. Spock, 424 U.S. 828, 838, 96 S.Ct. 1211, 1217-18, 47 L.Ed.2d 505 (1976) (access by certain civilian speakers and entertainers does not make military base a public forum). Nor is the fact that the DOC has entered into an agreement allowing COBA to post and distribute literature relating to periodic union elections sufficient to convert a particular space into a public forum. See Perry, 460 U.S. at 41, 103 S.Ct. at 952-53; Connecticut Teachers, 538 F.2d at 486; see also Int'l Society for Krishna Consciousness v. Lee, 505 U.S. 672, 678, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992); Knolls Action Project v. Knolls Atomic Power Lab. ("KAPL"), 771 F.2d 46, 49 (2d Cir. 1985).
It follows that since no public forum is involved, the DOC's regulations need only be reasonable in light of the purpose which the forum at issue serves, as long as it is not used in an effort to suppress expression because public officials oppose the views of the speaker. See Perry, 460 U.S. at 46, 103 S.Ct. at 955-56; Greer, 424 U.S. at 836, 96 S.Ct. at 1216-17; Adderley v. Florida, 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966), reh'g denied, 385 U.S. 1020, 87 S.Ct. 698, 17 L.Ed.2d 559 (1967). Even construed in the light most favorable to plaintiffs, see United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam), the record contains no allegation or indication that the Labor Relations Department intended to discourage one viewpoint and advance another. *1043 Rather, the Labor Relations Department created an access policy based upon the inflammatory subject matter of the fliers' contents. "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property." Perry, 460 U.S. at 49, 103 S.Ct. at 957.
Given the magnitude of security concerns inherent in the Control Building where about 4,500 corrections officers must be searched daily upon entry and exit, it is clear that restrictions on the posting of union fliers reasonably accommodate a compelling, let alone significant, state interest. Each uniformed employee must be individually cleared by security officers at the Control Building. Defs.' 3(g) Stmt. ¶ 7. Security concerns are especially critical in the Control Building given the crowding that occurs around the three daily shift changes. Id. ¶¶ 6, 7, 8. This is especially true since the Control Building is located in proximity to the Buono Bridge, where two disruptions involving Corrections Officers have recently occurred. Id. ¶ 9. "[W]e do not see the necessity for an employer to allow events to unfold to the extent that disruption of the office and the destruction of working relationships is manifest before taking action." Connick, 461 U.S. at 152, 103 S.Ct. at 1692; Perry, 460 U.S. at 49, 103 S.Ct. at 957 (proof of future disruption not necessary to justify denial of access to non-public forum on ground that proposed use may disrupt property's intended function). Thus, the DOC reasonably restricted the hand distribution of these two fliers in the Control Building, especially since the security and management concerns of officials in charge of correctional facilities relating to the inflammatory nature of the fliers are entitled to particular deference.[6]See, e.g., Hudson v. McMillian, 503 U.S. 1, 6, 112 S.Ct. 995, 998-99, 117 L.Ed.2d 156 (1992); Whitley v. Albers, 475 U.S. 312, 321-22, 106 S.Ct. 1078, 1085-86, 89 L.Ed.2d 251 (1986); Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979); Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 127, 97 S.Ct. 2532, 2538-39, 53 L.Ed.2d 629 (1977).[7]
In any event, even if the Control Building is a public forum, the government may enforce content-based restrictions on speech if those restrictions are necessary to serve a compelling state interest and are narrowly tailored to achieve that end. See Perry, 460 U.S. at 45, 103 S.Ct. at 954-55. To determine whether a public employee's First Amendment rights have been violated, a court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Giacalone, 850 F.2d at 85 (quoting Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35). In weighing the interests of the state, a court should give "substantial weight to government employers' reasonable predictions of disruption," even if the same justification would be accorded less deference *1044 when applied to the general public. See Waters, 511 U.S. at 673-74, 114 S.Ct. at 1887.
As set forth above, the state has a compelling interest in maintaining prison security with which courts have been reluctant to interfere. See, e.g. Jones, 433 U.S. at 126, 97 S.Ct. at 2538. Moreover, defendants' restrictions on the dissemination of fliers which it reasonably believes to be inflammatory is narrowly tailored where, as here, plaintiffs had numerous alternative fora to disseminate their message, many of which have been utilized by the union in the past.
Plaintiffs have posted fliers on bulletin boards throughout Rikers Island, including the facility locker rooms and bathroom walls. See Connecticut Teachers, 538 F.2d at 481-82 (availability of distribution of literature in teachers' lounge, discussion during lunch breaks and free periods, mail telephone and off-campus meetings rendered denial of access to school mail system inconsequential). The union has also hand distributed fliers at various times in the correctional facility locker rooms, the Health Management Division on Rikers Island, or on the street in Queens at the entrance to the Buono Bridge, the exclusive point of entry and egress from Rikers. Moreover, the union has conducted mass mailings, issued press releases, placed newspaper advertisements, and held membership meetings in common areas of Rikers. Indeed, in connection with the April 1993 vote, plaintiffs mailed each of the union members the same fliers and had an opportunity to express their views at four or five individual member meetings held in the correctional facilities as well as monthly meetings held before the vote.
In any event, the individual defendants are protected by qualified immunity. Qualified immunity shields government employees from liability for conduct which is objectively reasonable and "does not violate clearly established ... constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); see also Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038-39, 97 L.Ed.2d 523 (1987) (citations omitted).
Here, the parameters of plaintiffs' First Amendment rights in this factual context were not and could not be reasonably known to defendants at the time. Plaintiffs fail to cite any decision recognizing that communications regarding employee union personnel are matters of public concern or that the interior of a correctional facility, let alone a security check point, is a public forum. Nor has plaintiff come forward with a case holding that the security concerns in a correctional facility are outweighed by a employee union's right to disseminate fliers at a security checkpoint at that time. Indeed, as set forth above, the case law available at the time of the incident clearly indicates that the issues raised in the fliers were not of public concern, see Connick, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); Connecticut Teachers, 538 F.2d at 471, that the Control Building was not a public forum, see Perry, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); Krishna Consciousness, 505 U.S. 672, 112 S.Ct. 2701, and that the restrictions imposed were reasonable in light of the security concerns inherent in the Control Building, see, e.g., Jones, 433 U.S. at 134, 97 S.Ct. at 2542.[8]

CONCLUSION
For the reasons set forth above, defendant's motion for summary judgment is granted, and plaintiff's cross-motion for summary judgment is denied.
It is SO ORDERED.

APPENDIX A
Flier 1 provides:
*1045 VOTE YES
If you don't mail in your yes vote it will not be counted
If the no votes win
contract negotiations cannot go forward and your future salary and benefits will be destroyed
If the political opportunists win
your union will be in total turmoil this will result in a personal financial disaster
for every Correction Officer
Political opportunists are complaining to
city officials about our internal business how can the City take us seriously in contract negotiations with this kind of dis-unity
the City loves to see unions fight internally
the City is sitting back and laughing at us
ONLY A "YES" VOTE
CAN PROTECT YOUR FUTURE
Flier 2 provides:
IF YOU VOTE YES YOU WIN
IF YOU VOTE NO YOU LOSE
If you vote no the COBA will be disabled.
If you vote no the ¾ disability bill, heart bill, police status and 15 year paid pension initiative are dead.
If you vote no contract negotiations cannot go forward.
If you vote no union services will come to a halt.
If you vote no you may be carrying mace off-duty, instead of a gun. The administration would like to take away your off-duty guns. A disabled COBA would not be able to stop them.
If you vote no your salary, pension benefits, uniform allowance, retroactive money and sick leave are in danger and you can probably expect rescheduling of 20 tours to eliminate you overtime.
If you vote no you may be taken over by an outsider organization such as State Corrections (AFSCME) or the Captains Association, who just got the worst contract in the history of any labor organization in the City of New York.
If you vote no the Administration stooges and political opportunists will blame the Executive Board for all of the above losses. They want you to vote no, because that is the only way they can win.
IF YOU DON'T MAIL IN YOUR YES VOTE THE NO VOTES COULD WIN
IF THE ADMINISTRATION STOOGES AND POLITICAL OPPORTUNISTS WIN, YOU LOSE
THE ONLY WAY YOU CAN WIN IS TO VOTE YES
MAIL IN YOUR YES VOTE IMMEDIATELY. BALLOTS MUST BE RECEIVED BY MARCH 15, 1993
THE ONLY WAY YOU CAN WIN IS TO VOTE YES
Compl., Exhs. A, B.
NOTES
[1] Inmate visitors and all other members of the public pass through an adjacent building. See Stipulation dated March 23, 1995.
[2] The parties dispute whether both fliers were prohibited, or only the second flier. See Defs.' 3(g) Stmt. ¶ 23 (only one flier denied distribution); Pls.' 3(g) Stmt. ¶ 20 (both fliers denied distribution). However, for the purposes of the instant motion, the Court will assume that both fliers were prohibited.
[3] The DOC asserts that the statement was inaccurate because it is undisputed that no ban on carrying guns off-duty was ever proposed. Defs.' 3(g) Stmt. ¶ 25; Deposition of Stanley Israel Dated June 3 and 24, 1994 ("Israel Dep.") at 82-83; Deposition of Philip Seelig Dated June 3, 1994 ("Seelig Dep.") at 68. Plaintiffs assert that they believed that the DOC Commissioner favored such a restriction. Pls.' 3(g) Stmt. ¶ 25.
[4] In support of its contention that work stoppage posed a security risk, the DOC states that on August 13th, 1990, Corrections Officers staged a "job action" at the Buono Bridge, which blocked the thoroughfare for approximately thirty-five hours. This blockage was immediately followed by a violent inmate disturbance at Rikers. Defs.' 3(g) Stmt. ¶ 9. In addition, in 1993, New York City was granted a preliminary injunction restricting COBA from encouraging a strike or interference with traffic on the Buono Bridge. Id. ¶ 10. The injunction was granted in part because of distribution of a leaflet that threatened a walkout by COBA. Id. ¶ 10; Defs.' Not. Mot., Exh. 2.
[5] It is also undisputed that the fliers' reference to "political opportunists" relates to competing correction officer unions who seek to erode COBA's membership base. Israel Dep. at 84.
[6] Indeed, Israel and Seelig concede that the issue of off-duty guns is "very important" to the membership. Israel Dep. at 82; see also Seelig Dep. at 66.
[7] Courts have upheld regulations on speech in a wide variety of public spaces that have not been designated public fora. See, e.g., Krishna Consciousness, 505 U.S. at 678, 112 S.Ct. at 2705 (no soliciting in interior area of airport terminal); United States v. Kokinda, 497 U.S. 720, 734, 110 S.Ct. 3115, 3123-24, 111 L.Ed.2d 571 (1990) (no solicitation on post office sidewalk); Cornelius v. NAACP Legal Defense and Educational Fund Inc., 473 U.S. 788, 803, 105 S.Ct. 3439, 3449-50, 87 L.Ed.2d 567 (1985) (prohibiting political and policy organizations from participation in employee charity drive at federal workplace); Jones, 433 U.S. at 134, 97 S.Ct. at 2542 (no inmate solicitation, meetings or mailing of union material in correctional facility); Greer, 424 U.S. at 838-39, 96 S.Ct. at 1217-18 (no political demonstrations or leafletting on military base); Lehman v. City of Shaker Heights, 418 U.S. 298, 303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (no political ads on public bus displays); Adderley, 385 U.S. at 46-47, 87 S.Ct. at 246-47 (prohibition on trespass of jail entrance); Young v. New York City Transit Auth., 903 F.2d 146, 161-62 (2d Cir.1990) (no solicitation in subways), cert. denied, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990); Knolls Action, 771 F.2d at 49 (no leafletting in government nuclear research facility or its parking lot).
[8] In light of the above, the Court need not address defendants' contention that plaintiffs have failed to allege a rational factual basis for a finding that the individual defendants were personally involved in the alleged constitutional violation, or that the alleged violation resulted from a municipal policy or practice.